## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **VISION BANK, Special Administrator of** | ) | |
| **the Estate of Christopher Shawn Poor,** | ) | |
| **Deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. CIV-22-602-R** |
| | ) | |
| **CHANCE AVERY, and** | ) | |
| **THE CITY OF THE VILLAGE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This action arises from the fatal shooting of Christopher Shawn Poor by a City of the Village police officer during a civil standby call. Plaintiff Vision Bank, as the special administrator of Mr. Poor's estate, brought this action asserting claims pursuant to 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment against police officer Chance Avery and a claim for municipal liability against the Village. Now before the Court is Defendant Avery's Motion for Summary Judgment [Doc. No. 84] and Defendant City of the Village's Motion for Summary Judgment [Doc. No. 87]. Both motions are fully briefed and at issue [Doc. Nos. 100, 101, 105, 107, 117, 118].

## FACTUAL BACKGROUND

### A.  The Shooting

In the afternoon of July 25, 2020, Melissa Poor, along with her two children, drove to the parking lot of the Village Police Department and called the police dispatch. Ms. Poor told the dispatcher she was parked out front and needed an officer to go with her to 1601

1

Downing Street. She then stated: "I'm not going there without them. He's so mean and – he's threatened to ram my vehicle. Like he's facing so many charges right now of third-degree arson, and he's got court tomorrow, so – he's drinking heavily." *See* Doc. No. 84-5; 87-9.

Village Police Department officer Chance Avery was assigned the call. The police dispatcher testified at her deposition that she told Avery, who was standing next to Village Police Sergeant Roberto Vargas, that there was a "caution" at this address, meaning there was someone at the house with mental health issues. However, Avery testified that he did not know that a caution had been placed on the house. Coincidentally, Avery himself had placed a caution on the house several months prior. *See* Plaintiff's Fact Nos. 3-4, Village's Fact No. 38.

After being assigned the call, Avery, dressed in a uniform that clearly identified him as a police officer, followed Ms. Poor's vehicle to the house. When they arrived, Ms. Poor entered the house with Avery following behind. As they approached the front porch, Avery activated his body-word camera, which captured audio and video footage of the critical events. *See* Avery's Fact. No. 14-15; Village's Fact Nos. 11-12.

The video [Doc. Nos. 84-7; 87-11] shows the following: Ms. Poor enters a bedroom and begins gathering items to take with her. Avery is standing in a hallway outside the bedroom. Ms. Poor then states "He's out there. He's drinking pretty hard, so…". Avery asks "In the back?" and Ms. Poor responds "In the garage." Avery then steps just inside the bedroom doorway where Ms. Poor is gathering her things. Ms. Poor then says "He's just so mean. I wish I didn't have to do this, but this baby."

A few seconds later there is a noise followed by Mr. Poor asking loudly "Where's the goddamn police?" Avery, who had been facing the bedroom, turns toward the living room, draws his gun, and says "Put the bat down right now." Avery, gun drawn, is now facing Poor, who is standing in the living room holding an aluminum baseball bat in his right hand. Poor says either "I will, I'm glad you're here" or "I will, now you're here" while tipping the front of the bat up and pointing it in Avery's direction. He then turns and walks further into the living room. Avery radios for another unit, commands Poor to "Put the bat down now," and follows Poor into the living room. Poor says "I'm putting it down, I just asked where…" and Avery says again "Set it down!" Poor, now holding the bat in his left hand, points his right finger at Avery and says "You put that down, you're in my fucking house." At the same time, Avery says "Set it down!" and Ms. Poor, who is standing behind Avery, can be heard saying "Set it down."

The following moments happen over a matter of two to three seconds. Poor takes a step and moves the bat from his left hand to his right hand, Avery says "Set it down!" again, and Avery fires three rapid shots at Poor. Defendants describe Poor as being five to six feet away from Avery at the time the shots were fired. Avery immediately radios for additional units and emergency medical services, but Poor dies from the wounds. Approximately sixteen seconds elapsed from the time Poor can first be heard on the video to the time Avery fired the shots.

### B.  The Policies, Customs, and Training of the Village Police Department

Avery became a certified law enforcement officer in 2012 and worked for the Custer County Sherriff's Department as a deputy. He was hired by the Village Police Department

in 2016 and went through its field training program, which included training on the VPD's policy manual. Avery has received numerous hours of training from the Council on Law Enforcement and Training and from the VPD, including training on Use of Force and Crisis Intervention Team. *See* Village's Fact Nos. 1-4, 41-46; Avery's Fact Nos. 1-2. Prior to this incident, Avery had been involved in other uses of force. When Village Chief of Police Russ Landon was asked whether that raised concerns, he testified "that thought crossed my mind" just based on "the number compared to other officers." *See* Pl.'s Fact No. 1.

The VPD's policy on use of force states that "[o]fficers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the events to accomplish a legitimate law enforcement purpose." The policy further states that "[a]n officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury." The policy also sets forth numerous factors that can be used to determine whether to apply force including, among others, the immediacy and severity of the threat, the individual's mental state, proximity of weapons, and the availability of other options. *See* Doc. No. 87-15.

The VPD also maintains a policy on responding to civil disputes, which is intended to provide members of the police department "with guidance for addressing conflicts between persons when no criminal investigation or enforcement action is warranted…with the goal of minimizing any potential for violence or criminal acts." The policy states that civil disputes "tend to be confrontational" and "de-escalation techniques should be used when appropriate." Pertinent here, the policy contains a specific provision for responding

to standby requests where a person is seeking assistance retrieving property. This section states that officers should accompany the person to the location of the property and ask if the other party will allow removal of the property. *See* Doc. No. 87-16.

Although not part of the formal written policy, Chief Landon testified that officers are trained that they should perform civil standby calls with backup and doing a civil standby alone is against training. Chief Landon further testified that Sgt. Vargas and another officer had told him that it was not uncommon for one officer to go on a civil standby. Chief Landon stated that having only one officer respond to a civil standby is contrary to policy and training and that if that is the general practice, it should have been caught by a supervisor and it needs to change. Chief Landon also testified that having two officers go to a civil standby provides greater safety and protection of citizen's constitutional rights and that a different outcome "could have" occurred if two officers had responded to this incident. *See* Doc. No. 101-2 at 47:1-50:12; 53:9-56:1. A police practices expert retained by Avery testified that, given the caution placed on the residence, two officers should have responded to this call and that having two officers respond increases the probability of a better outcome. Doc. No. 101-1 at 23:17-31:15. Plaintiff's police practices expert also testified that two officers should have responded to the call. He further opined that if the policies were followed, "the outcome would have been different" and the shooting would not have occurred but for the failure to follow policy. Doc. No. 101-3 at 11:9-25; 16:15-18:8.

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.... An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, at this stage, the court's role is not "to weigh the evidence and determine the truth of the matter," but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249–52. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

## DISCUSSION

### A. Fourth Amendment Excessive Force Claim Against Avery

Plaintiff asserts that Avery used excessive force in violation of the Fourth Amendment. Avery moves for summary judgment on this claim, invoking the defense of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "When a defendant

asserts qualified immunity at the summary-judgment stage, the burden shifts to the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Alcala v. Ortega*, 128 F.4th 1298, 1306 (10th Cir. 2025) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The plaintiff must satisfy both prongs to overcome a qualified immunity defense." *Id.* (quoting *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 757–58 (10th Cir. 2021). Here, Plaintiff has met its burden of showing both a violation of a constitutional right and that the right was clearly established.

### A. The Constitutional Violation

Plaintiff asserts that Avery violated Poor's Fourth Amendment right to be free from excessive force by escalating a civil standby call, provoking Poor in his own home, and fatally shooting Poor when he posed no immediate threat of serious bodily injury or death. A claim asserting excessive force in violation of the Fourth Amendment is analyzed "under a standard of objective reasonableness." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015). "To assess objective reasonableness we evaluate whether the 'totality of the circumstances' justified the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020) (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009)). Importantly, this standard makes allowances "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Thus, an officer's

decision as to a use of force "need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable." *Tenorio*, 802 F. 3d at 1164.

> In analyzing whether force was reasonable, courts are guided by
>
> three nondispositive factors, known as the *Graham* factors: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or trying to flee. In a deadly-force case, we also consider whether the officer had probable cause to believe that there is a threat of serious physical harm to the officer or to others.
>
> To determine whether a reasonable officer would have probable cause to believe the suspect presented an immediate threat of serious physical harm, we are guided by four nonexclusive sub-factors, known as the *Larsen* factors: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

*Baca v. Cosper*, 128 F.4th 1319, 1325 (10th Cir. 2025) (internal quotation marks and citations omitted). In addition to these factors, courts "must also consider whether an officer's 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)).

Of course, these factors "are only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Tenorio*, 802 F.3d at 1164 (quoting *Est. of Larsen v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008)). "'[A]ll the relevant circumstances, including facts and events leading up to the climactic moment,' rather than just the 'moment-of-threat,'" must be considered when evaluating whether the force was

objectively reasonable. *Teetz v. Stepien*, 142 F.4th 705, 723 (10th Cir. 2025) (quoting *Barnes v. Felix*, __ U.S. __, 145 S. Ct. 1353, 1356 (2025)).

Here, the first *Graham* factor – severity of the crime – weighs in Plaintiff's favor because there was no crime at issue. Avery was accompanying Ms. Poor to her home to retrieve some items as part of a civil standby call. *See Perea v. Baca,* 817 F.3d 1198, 1202 (10th Cir. 2016) (finding that the first factor "weighs heavily against the use of anything more than minimal force" because "the officers were performing a welfare check" and "were not looking for him because they suspected he committed a crime).

The third *Graham* factor – active resistance or attempt to flee – likewise weighs in Plaintiff's favor, and even Avery concedes as much. *See* Doc. No. 84 at p. 26. Avery was not there to make an arrest, and Poor was not attempting to flee. *See Taylor*, 16 F.4th at 764 (finding that the third factor weighs in the plaintiff's favor because the officers "did not have probable cause to make an arrest, nor could they reasonably have intended to make an arrest" at the time they approached the victim).

Although these two factors weigh in Plaintiff's favor, "the second factor — whether there is an immediate threat to safety — 'is undoubtedly the most important.'" *Valverde*, 967 F.3d at 1060-61 (quoting *Pauly v. White,* 874 F.3d 1197, 1216 (10th Cir. 2017)). "That is particularly true when[,]" as here, "the issue is whether an officer reasonably believed that he faced a threat of serious physical harm." *Id.* at 1061. In this case, the evidence as it relates to this factor is more mixed. Defendants emphasize that Avery instructed Poor to put the baseball bat down numerous times, Poor was exhibiting aggressive behavior such as speaking loudly and pointing his finger at Avery, and they were in a confined area when

the shots were fired. Additionally, as Defendants describe it, Poor took a step towards Avery while shifting the baseball bat into his dominant hand and raising it slightly, which caused Avery to believe Poor was going to attack him.

Plaintiff presents a decidedly different interpretation of the events. In Plaintiff's telling, Avery needlessly escalated the situation, provoked Poor's behavior, and made several critical errors that ultimately resulted in a wrongful use of deadly force. Plaintiff argues that Avery violated Village Police Department policy by not attempting to speak with Poor before entering the house, failing to use de-escalation techniques, and following Poor into the living room rather than retreating out of the house. Most significantly, Plaintiff contends that two officers should have responded to the call and that this error was particularly egregious in light of the "caution" that had been placed on the address. Plaintiff also emphasizes that Avery never specifically warned Poor that he would shoot and disputes that Poor raised the baseball bat or did anything that would suggest an imminent threat to Avery.

Avery downplays any policy violations and tactical errors preceding the use of force as immaterial to the objective reasonableness analysis and contends there is no evidence that he acted recklessly or deliberately provoked Poor.[1] Plaintiff does not specifically assert

---

[1] *See Arnold*, 35 F.4th at 789 ("[O]ur cases suggest that recklessness is manifested mostly by police onslaught at the victim.") (quotation omitted); *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005) ("This Court has consistently held that the violation of police regulations is insufficient to ground a § 1983 action for excessive force."); *Sevier v. City of Lawrence*, 60 F.3d 695, 699 .7 (10th Cir. 1995) ("Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983."); *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) ("Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."); *Finch v. City of Wichita*, No. 18-

that Avery's conduct was reckless, and the Court finds it unnecessary to make such a determination. Even if, as Defendants argue, Avery's alleged policy violations and tactical errors are immaterial, a reasonable juror could still conclude that the use of deadly force under these circumstances was objectively unreasonable. The body camera footage, which clearly captured the crucial events, shows that the situation unfolded quickly, that Poor and Avery were in a confined space only a few feet apart, and that Poor did not put the baseball bat down despite Avery's repeated commands. However, viewing the evidence in Plaintiff's favor, Poor was not charging Avery, he was not swinging the bat, and he was not raising it or otherwise engaging in motions that might suggest an imminent threat of serious physical harm. Given the totality of circumstances, a reasonable jury could find that Avery's use of force was objectively unreasonable and Plaintiff has therefore satisfied the first prong of the qualified immunity analysis.

**B. Clearly Established Law**

Although a reasonable jury could find a Fourth Amendment violation, Avery is still entitled to qualified immunity unless Plaintiff can show that the violation was clearly established at the time of the incident. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the

---

1018-JWB, 2020 WL 3403121, at *20 (D. Kan. June 19, 2020), aff'd sub nom. *Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022) ("An officer who fails to 'de-escalate' or 'plan effectively' may have violated departmental policy, but that does not mean the officer violated the Fourth Amendment.").

plaintiff maintains." *Tenorio*, 802 F.3d at 1163-64 (internal quotation marks omitted). This inquiry requires careful attention to the specific facts of the case:

> The Supreme Court has warned against defining a clearly established right at a high level of generality. Instead, the clearly established law must be particularized to the facts of the case. This is not to say that there must be a case directly on point for a right to be clearly established. But the existing precedent must have placed the statutory or constitutional question beyond debate. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

*Est. of Ceballos v. Husk*, 919 F.3d 1204, 1214-15 (10th Cir. 2019) (internal quotation marks and citations omitted). "Specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (brackets, ellipses, and quotation omitted).

Here, the clearly established law is set out in *Tenorio*, 802 F.3d at 1164-1166.[2] The Tenth Circuit summarized the facts presented in *Tenorio* as follows:

---

[2] Even though Plaintiff bears the burden of identifying clearly established law at an appropriate level of specificity, Plaintiff relies, primarily, on general principles governing excessive force claims. Nevertheless, Plaintiff argues that Avery violated clearly established law by pursuing Poor into the living room and using deadly force against a passively noncompliant subject that did not present an imminent threat. "[I]n qualified immunity cases, the Supreme Court has instructed a reviewing court to 'use its full knowledge of its own and other relevant precedents.'" *Cosper*, 128 F.4th at 1327 n.5 (quoting *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). Thus, although "[i]nadequate briefing can cause parties to forfeit claims and arguments," the Court is obligated to "conduct [its] clearly established analysis with full knowledge of settled case law." *Id.* (quotation omitted).

police were called to the home of a man (Russell Tenorio) who was intoxicated, waving a knife around, holding a knife to his own throat, and threatening self-harm. The 911 caller said she was afraid Tenorio was going to hurt himself or his wife. The dispatcher told the responding officers that Tenorio had a history of violence and that other family members, including the caller, were inside the home. When the officers arrived, they were met in the front yard by the 911 caller, who was still speaking to the dispatcher and appeared frightened. After speaking briefly with her, the officers walked through the front door and into the living room, which was about 14 feet by 16 feet. The officers heard no raised voices or other sounds that suggested a disturbance.

Tenorio, his wife, and another man were inside the kitchen, which was partially visible from the living room where the officers were standing. As the officers entered the living room, one officer said, "Please step out here." Tenorio's wife stepped out of the kitchen first and said, "Russell, put that down." Tenorio followed her out of the kitchen, and the other man in the kitchen followed him. An officer assisted Tenorio's wife from the house. When Tenorio appeared to the officers, he had a blank stare on his face and was holding a santoku-style kitchen knife with a three-and-a-quarter-inch blade. "He was holding the knife loosely in his right hand, his arm hanging by his side ...." As Tenorio entered the living room, he kept walking at an unbroken "average speed." The lead officer saw the knife in his hand and yelled at him four times in rapid succession to put the knife down. But Tenorio continued another two and one-half steps into the 14-by-16-foot living room without dropping the knife. With the doorway congested with law-enforcement officers, the lead officer shot him and another officer tased him, causing nonfatal but life-threatening injuries.

*Cosper*, 128 F.4th at 1328 (internal citations omitted). Presented with these facts, the Tenth Circuit rejected the officer's assertion of qualified immunity because prior cases "'specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect.'" *Tenorio*, 802 F.3d at 1165-66 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006)).

This standard applies here. [3] A reasonable juror construing the evidence in Plaintiff's favor could find that, like the suspect in *Tenorio*, Poor was not charging the officer when he stepped forward and was not making aggressive actions with the baseball bat toward the officer. Further, in some ways, the facts in this case present an even weaker justification for the use of deadly force than was present in *Tenorio*. In *Tenorio*, the police were contacted because a man was waiving a knife and threatening harm to himself and others. Here, in contrast, the police were contacted to assist Ms. Poor in recovering her property and, although she reported that Poor had been drinking and was "so mean," there was no indication that he had threatened anyone with the baseball bat. Further, although a baseball bat could certainly be used to inflict deadly force, a knife arguably has greater lethal potential.

The conclusion that a reasonable juror could find that Avery's use of deadly force violated clearly established law is in accord with the Tenth Circuit's recent decision in *Baca*

---

[3] Avery argues that *Estate of Larsen*, 511 F.3d at 1255, establishes that the use of force was objectively reasonable, but the facts of that case are distinguishable. In *Estate of Larsen*, the police responded to a call that a man was threatening to kill himself or others. *Id.* at 1258. The officers approached the man, who was standing alone on his front porch holding a knife with a one foot long blade, and instructed the man to put the knife down. *Id.* The man, who was seven to twelve feet away, turned toward one of the officers with the knife raised above his shoulder and pointed outward. *Id.* The officer continued to warn him to put the knife down. *Id.* The man took a step towards the officer, who fired two fatal shots. *Id.* at 1258-59. The Tenth Circuit found no Fourth Amendment violation because the officer could reasonably conclude that the man posed an immediate threat when, after ignoring four commands, he turned and stepped toward the officer with a large knife raised in a provocative motion. *Id.* at 1263. Here, unlike *Larsen*, a reasonable juror could conclude that Poor did not make a hostile action towards the officer. *See Tenorio*, 802 F.3d at 1166 (distinguishing *Larsen* for this reason). Because there is a genuine factual dispute as to whether, given the totality of the circumstances, the officer reasonably perceived a threat, Avery is not entitled to qualified immunity.

*v. Cosper*, 128 F.4th 1319 (10th Cir. 2025). In *Cosper*, the police were called to the home of an elderly, mentally ill woman who "had become aggressive and threatened to kill her and her daughter." *Id.* at 1321. A lone officer arrived at the house and entered the living room about ten feet from the woman, who was holding a knife in each hand. *Id.* at 1323. The officer immediately pointed his firearm at the woman and began yelling at her to drop the knives. *Id.* About thirty seconds later, the woman moved both knives to her right hand, pointing them at the floor, and took two steps towards the officer. *Id.* at 1324. On the second step, when she was about six feet away, the officer fired two fatal shots. *Id.* The Tenth Circuit relied on *Tenorio* to conclude that the use of deadly force where the woman "was not charging" the officer and "made no slicing or stabbing motions toward him" violated clearly established law. Likewise, here, the evidence supports a finding that Poor, although carrying a baseball and in a confined area, was not charging the officer and was not making aggressive motions with the baseball bat toward the officer. *Cosper* found that, based on the law set out in *Tenorio*, an officer that fatally shot a non-compliant suspect that was walking towards the officer in a small area while holding a potentially deadly weapon was not entitled to qualified immunity. *Tenorio* compels the same result in this case.

Accordingly, Defendant Avery is not entitled to qualified immunity.

### B. Punitive Damages Claim Against Mr. Avery

Plaintiff's Second Amended Complaint demands punitive damages from Avery. Avery moves for summary judgment on this request, contending that there is no evidence that he acted with malice, evil intent, or subjectively knew his actions were unconstitutional. Punitive damages are recoverable against a defendant sued in his

individual capacity under § 1983 "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Eisenhour v. Cnty.*, 897 F.3d 1272, 1280–81 (10th Cir. 2018) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "'[R]eckless or callous indifference' requires that the defendant have acted 'in the face of a perceived risk that its actions will violate federal law.'" *Id.* at 1281 (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999)). Plaintiff's response brief and surreply do not offer any response to Avery's argument and the request for punitive damages is therefore deemed confessed. *See* LCvR7.1; *Hinsdale v. City of Liberal, Kansas*, 19 Fed. Appx. 749, 768–70 (10th Cir. 2001) (affirming district court's presumption that plaintiff abandoned an argument raised in his complaint where plaintiff did not address the argument in his response to defendant's motion for summary judgment); *Bowdish v. Fed. Express Corp.*, 699 F. Supp. 2d 1306, 1326 (W.D. Okla. 2010) (deeming issue confessed where response brief failed to address it).

### C. Municipal Liability Claim Against the Village

Plaintiff asserts a municipal liability claim against the Village based on its alleged failure to properly hire, train and supervise Avery regarding the use of force and the proper procedures for handling civil disputes. The Village moves for summary judgment, contending there is no basis for imposing municipal liability.

"A municipality is not directly liable for the constitutional torts of its employees." *Finch*, 38 F.4th at 1244. Thus, to succeed on a municipal liability claim under § 1983, the

plaintiff must, in addition to proving an underlying constitutional violation,[4] "show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996). With respect to the first element, "[a] challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)).

Here, Plaintiff argues the Village failed to adopt a formal policy requiring two officers to respond to civil standby calls and also maintained a well-established custom of allowing only one officer to respond. In support, it points to Chief Landon's testimony that it was not uncommon for only one officer to respond to a civil standby call, which is contrary to VPD's training. Assuming without deciding that this is enough to show the existence of a policy or custom for purposes of municipal liability, Plaintiff must still "present sufficient evidence to create a genuine issue of material fact as to causation." *Id.* at 780.

To establish causation in the municipal liability context,

it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must

---

[4] The Village also argues that Avery did not commit a constitutional violation but, for the same reasons outlined above, the Court finds that there is a genuine factual dispute as to whether Avery used excessive force in violation of the Fourth Amendment.

demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). "[T]he challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770 (quotation omitted). Notably, when the municipal practice is not itself unconstitutional, the causation element must be "rigorously scrutinize[d]…to ensure that the municipality is not held liable solely for its employees' actions." *Arnold*, 35 F.4th at 795 (10th Cir. 2022). Indeed, "[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983" because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton, v. Harris*, 489 U.S. 378, 391 (1989).

Plaintiff has not presented sufficient evidence to establish a direct causal link between the Village's alleged custom of sending only one officer on a civil standby call and the violation of Poor's Fourth Amendment rights. The policy itself is not unconstitutional, and the execution of the policy did not directly inflict Poor's injury. In other words, the mere fact that Avery responded to the call by himself did not directly cause Avery to impermissibly use deadly force. *See Brown*, 520 U.S. at 405 ("Sheriff Moore's hiring decision was itself legal, and Sheriff Moore did not authorize Burns to use excessive force."); *Hollingsworth v. Hill*, 110 F.3d 733, 744 (10th Cir. 1997) ("The execution of the custom itself did not inflict Hollingsworth's injury….Rather, Hill's independent decision

to remove Ms. Hollingsworth's children inflicted her injury."); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) (noting the "wide difference" between a municipal policy that "by its terms" violates a constitutional right and one that is "a good deal further removed from the constitutional violation").

Plaintiff argues that Poor's death was the direct result of the VPD's custom because, if two officers had respond to the call, Avery would not have "overreacted" and one officer could have interacted with Poor while the other assisted Ms. Poor. Plaintiff also relies on expert testimony and Chief Landon's testimony that a different or better outcome could have occurred if two officers had responded to this call. But this is largely speculation; even if one officer had gone with Ms. Poor to the bedroom, Avery may still have encountered Poor in the living room, baseball bat in hand.[5] *Schneider*, 717 F.3d at 780 ("Mere speculation that something would have been done to prevent [the] injury is not sufficient to establish causation."). Undoubtedly, in many situations where law enforcement is called to respond, the situation would be safer (for both the officer and those at the scene) and the outcome somehow different if multiple officers are present. That does not necessarily establish that a policy where a single officer responds to a call, even those types of calls that "tend to be confrontational," was the direct cause of an officer's subsequent impermissible use of force.

---

[5] To the extent Plaintiff suggests that Avery committed other errors, such as not knocking on the door to ask Poor if he would allow Mrs. Poor to retrieve her items, those alleged errors are contrary to the VPD's written policy and there is no evidence that the policy was routinely ignored such that it could be considered a well-established practice or custom. Those errors therefore cannot form the basis of a municipal liability claim against the Village.

In *Tuttle*, 471 U.S. at 823, the Supreme Court explained that

> if one retreats far enough from a constitutional violation some municipal "policy" can be identified behind almost any such harm inflicted by a municipal official; for example, [the officer] would never have killed [the plaintiff] if [the] City did not have a "policy" of establishing a police force. But [municipal liability] must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was "caused" by the municipal "policy." At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.

An affirmative link is missing in this case. Plaintiff has not connected the VPD's custom of sending one officer on a civil standby to the particular constitutional violation alleged – the unreasonable use of deadly force. Avery's decision to use deadly force inflicted the constitutional violation, not the VPD's custom of sending one officer on a civil standby call. Moreover, the fact that the custom may by inconsistent with national police standards or "might lead to 'police misconduct' is hardly sufficient to satisfy [the] requirement that the particular policy be the 'moving force' behind a constitutional violation." *Id.* at 824 n. 8; *see also Arnold*, 35 F.4th at 796 (finding that the city's policy requiring confirmation of a firearm before activating a tactical unit was not the cause of a police officer's subsequent use of deadly force); *Porro v. Barnes*, 624 F.3d 1322, 1329–30 (10th Cir. 2010) ("Simply put, the failure to enforce a prophylactic policy imposing a standard of care well in excess of what due process requires cannot be—and we hold is not—enough by itself to create a triable question over whether county officials were deliberately indifferent to the Constitution."); *Hollingsworth*, 110 F.3d 733, 744 (10th Cir. 1997) (finding that police department's custom of seeking legal advice from district attorney was not the cause of officer's improper enforcement of a child protective order); *Romero v. Bd. of Cnty.*

*Comm'rs of Cnty. of Lake*, 60 F.3d 702, 705 (10th Cir. 1995) (noting that "violations of state law and police procedure generally do not give rise to a § 1983 claim").

Plaintiff also argues that the Village's inadequate training of Avery caused the constitutional violation. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388 (1989). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id*.

Plaintiff argues that the Village failed to adequately train Avery not to escalate a civil standby call and failed to train him to use de-escalation techniques. But Plaintiff has fails to point to evidence supporting its assertion that the Village's training of Avery was deficient. The VPD's civil disputes policy states that civil disputes can escalate to violence quickly, de-escalation techniques should be used when appropriate, and officers should endeavor to maintain a calm presence. Avery was trained on the VPD's policy and received numerous hours of training on topics relevant to the facts of this case, including training on use of force decision-making and crisis intervention. Plaintiff does not identify any specific deficiencies with the training or any pattern of similar constitutional violations that would put the Village on notice that more or different training was required. *See Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010) ("Rather, a plaintiff must identify a specific deficiency that was obvious and closely related to his injury, so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional

rights and the moving force behind his injury.") (internal quotation marks and citation omitted). Plaintiff's conclusory argument that Avery was unsatisfactorily trained because he used excessive force in this instance is not sufficient to impose municipal liability.

Last, to the extent Plaintiff alleged a claim against the Village based on a failure to supervise or inadequate hiring, it has confessed those claims by failing to present an argument in opposition to the Village's motion on those issues. But regardless, Plaintiff has not identified evidence from which a reasonable juror could conclude that the Village acted with deliberate indifference in its hiring or supervision of Avery. *See Brown*, 520 U.S. at 411 ("Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"); *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) ("Finally, at least for claims of inadequate hiring, training, or other supervisory practices, a plaintiff must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.") (quotation omitted).

## CONCLUSION

For the reasons stated above, Defendant Avery's Motion for Summary Judgment is DENIED and Defendant City of the Village's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 5th day of September, 2025.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE